May it please the court. I would like to start with an observation by Justice Robert Jackson 77 years ago in the case of West Virginia Board of Education v. Barnett, which is, if there is any fixed star in our constitutional constellation, it is that no official, high or petty, may prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion. This is a case where two officials, a deputy chief and a captain with Las Vegas Metropolitan Police Department, which I'm just going to refer to as Metro because that's what we call it here in Las Vegas, determined that a disciplinary transfer should be given to a SWAT sniper, not because of any disruption that his speech caused, but solely because they, and by extension the department, didn't like it. Metro does not dispute this. They concede it in the record. I'm sorry, what did they concede? They concede that the reason that he got the transfer was they felt his statements were contrary to their values. That's on page 32 of their answering brief, that they felt his statement was contrary to their mission statement and conflicted with their ICARE values. It was the content of the speech, not any disruption, which was the basis for the transfer. Let me ask you something. This case made me wonder the following. I mean, the case law all talks about disruption in the workplace because that's what the cases tend to be about, but from pickering on, there is some recognition that if the speech demonstrated a lack of qualification for the position, why does there have to be disruption? I mean, you can think of various hypotheticals. For example, one assumes that the policy of the police department here is not to shoot unnecessarily. Let's suppose he had some more distinct statement that said, I do not agree with this policy and I do not intend to follow it. I believe that you should shoot at a suspect whether he's dangerous or not. That's what I intend to do and that should be the first amendment. No, because under the pickering balancing test, a reasonable prediction of disruption is sufficient. Why is it disruption? That's what I'm saying. It doesn't seem to be disruption. It's that he's not qualified for his job because he has an intention to act in a way that's contrary to the position and policy of the police department. I don't know. Why does he have to disrupt anything? Well, disruption is defined broadly as damaging harmony and working relationships and the government's interest in promoting an effective workplace. A statement such as, I do not agree and I do not intend to follow it would be an outright declaration of insubordination, which would justify it. It would be an outright declaration that he's not qualified for his job and you wouldn't hire this person. You shouldn't have to keep him. That's what I understood. A statement that I won't follow this directive would be sufficient under the pickering balancing test, whether you use the word disruption or not to impose discipline, but that is not what happened. So, my instinct that disruption is one way of demonstrating that there is a management interest, but it's not the only way. I would say that a failure of qualification for a position by definition is disruptive to workplace efficiency. I don't see the distinction. I don't know why we want to push it into a disruption because it's really not what it's about, but you can call it that if you want to. All the emphasis on how other people are going to react doesn't seem to necessarily be the point. Well, as I pointed out in both the district court below in the briefing, under Graham v. Connor, any shooting in the future, the reasonableness of that, the subjective intent of the shooter is absolutely irrelevant. As Graham v. Connor says, even a shooting with bad intent is irrelevant. It's objective reasonableness. So, a statement of the sort that goes to qualifications is not going to have any practical implication other than, in my view, the insubordinate nature which would in and of itself justify discipline under the balancing test. What the court did, however, in this case was attempt to devalue the speech to suggest that it perhaps was not on a significant matter of public concern, even though the defendants conceded that it was. The court says it is not of the same ilk as the speech that that is incorrect. A commentary on a news story is often by definition of public concern, and I'd like to read a quote from that I stumbled across in the Janus decision, which says, climate change, the confederacy, sexual orientation, and gender identity, evolution, and minority religions, these are sensitive political topics and they are undoubtedly matters of profound value and concern to the public, and therefore they get treatment as the, they occupy the hierarchy. Excuse me, I didn't understand the district court to be suggesting that the issue wasn't of public importance. I think what he was suggesting was that the speech was of no, um, was it, was in no way analytical or reasoned or anything to present a viewpoint for consideration on that topic. In other words, he, if he had made a, in most of the other cases, you have somebody going to a superior or to go to the public or something and saying, this policy is a very bad idea, and this is the reason why it's a bad idea, and there's some contribution to the public dialogue, and I understood what he was saying here was that, given what he actually said, not that it was an issue of public importance and somebody could have made a comment on, but this was really just a spouting off, essentially. Well, interestingly enough, the district court contradicted itself on this very issue. I quote on page 10 of the brief from, uh, volume one of the record at page 49, where the district court says, indeed, it is difficult to discern what message Moser was attempting to convey, yet later she attributes to Moser a meaning which was contrary to the evidence that he conveyed that he wanted his fellow officers to shoot and possibly kill the suspect. Are we on summary judgment? Yes, this is summary judgment. Well, I think it is, and let me explain the reasoning, and this goes to the comment that you just, uh, or the question you just directed to me, which is, it doesn't seem to advance, you know, the operational efficiency or a commentary on that. That is not the sole basis for, uh, protected speech. I'm going to quote, uh, fellow circuit Jackson versus Blair, 851 Federal 2nd, 714, that speech need only be upon a matter of public concern. Its practical effectiveness in addressing the concern is irrelevant. Even the most fatuous and ineffectual rhetoric may meet this threshold requirement. Indeed, if you take the erroneous... Well, the question isn't whether it meets the threshold, which it surely does, but Pickering is a balancing test, right? Correct. All right. So, are you, is your contention that once it crosses the threshold, um, we don't look any further at the nature of the speech? Um, no. You will look at the Pickering balancing test, which is, does it damage relationships? Does it impact the efficiency of the workplace? And that requires actual evidence The actual speech has nothing to do with it. Yes, I agree. And I would make the observation that Ardeth McPherson's comment about the assassination of President Reagan, shoot, if they go for him again, I hope they get him, has absolutely no effect on the operational efficiency of the constable's office. It is of exactly the same ilk as Charles Moser's. Right. But she wasn't a policeman. No, she's not, but she is an employee of the constable's office and... Isn't the suggestion, the opinion that if she were a police officer, it might be quite different. I don't read it that way. I read it as she made the comment as a private citizen on a matter of public concern. And at that point you go to the Pickering balancing test and the burden is on the employer to produce actual evidence of disruption or interference or impairment to itself or its operations. And that must be under Nichols versus Dancer out of this circuit, joining the other circuits, must be evidence, not speculative. Anybody can say, oh, well, I think this hurts us, but it must be actual evidence must be presented by which the court can measure the impact. And that didn't happen in this case. Instead, the district court actually resorted to her own speculation, saying if Mr. Moser were discovered to be an employee of the police department, because it was not apparent in the post. And as I indicated in footnote seven of the opening brief, the record was never developed as to the privacy settings on the Facebook page. So we don't even know whether the public could have seen this. But for purposes of re-judgment, it must be presumed in a light most favorable to Mr. Moser that they couldn't. But even if they discovered it in the view of the district court. But you could have developed it. I couldn't. It's not my burden on Pickering. Under Pickering, the burden is on the employer, not me. Somebody saw it because it was reported, right? Right. But as I indicated in footnote seven, it must be presumed at the summary judgment stage that it was a participant in the conversation and not public. You have to understand, I have no Facebook account, no Twitter account. If you Google my name, Adam Levine, you get the singer from Maroon 5. I have social media. I have a question. Is it your position that this should go back and the court should have a trial on this issue of disruption and put in witnesses or something? No. I believe that upon remand, summary judgment on liability should be granted because there was no evidence presented. In other words, if there were evidence presented and there was an issue of fact as to disruption, then you would have a trial. But when there's no evidence presented, the case law from this circuit and other circuits says, one, you're liable. And second, there is no qualified immunity if no evidence is presented. So my position is it should be remanded for consideration of the Monell issues and at least liability granted in favor of partial summary judgment in favor of Charles Moser. That is my position. When did Mr. Moser delete his comment on Facebook? I believe, that was not clear. The when was not clear, but presumably as soon as he was notified by internal affairs that he was under investigation. That would be a fair assumption. Would suppose a SWAT officer post something on Facebook commenting on a public issue, but uses a racial slur in that context. Would Metro have the right to fire that officer or demote that officer? Yes, because racial slur would contain a reasonable probability of disruption and other officers not wanting to work with that officer. Most cases dealing with such as the Grumacher case that was briefed extensively below out of the, I believe, the Fourth Circuit. Most of those cases observed that racial slurs generally are private grievances are not on a matter of public concern. But in your example, if it wasn't a matter of public concern, but used a racial slur, there's a reasonable prediction of damaging working relationships. Again, actual disruption is required only evidence of a reasonable prediction, and I think you would have it in that instance. And in particularly given the importance of this public issue, and the at this point now, the statement that it's an understanding of the statement, and I understand that Mr. Moser says it's not what he meant, but that this person should have been shot or killed when he was arrested, whether that was necessary or not, that would not be at this juncture, fairly similar to a racial slur even be understood as a racial slur. I don't know what the races were the people here. But nonetheless, the issue, the notion that of how police should behave in with regard to the use of force is not of the same oak at this juncture, at least. Well, it's interesting, because I've given a lot of to that issue. The inappropriate nature of a comment, of course, is irrelevant to whether it's a public concern for Rankin. And however, in this particular case, of course, that's a public concern. That's why there's there's an interest in the government of with regard to this particular case. The record actually reflects that the defendants conceded that for all they knew, the public would agree with Mr. Moser sentiment attacks upon police. I don't understand why that matters. And maybe maybe I mean, what we know right now is that some members of the public would agree and others would disagree. And it would be it's a matter of enormous controversy. Yes. So why does it matter that people would agree? Some people would agree. Well, but that's exactly why it's political speech and entitled to protection because that's protection. But that's not the question. The question is, is the reasonable prediction of disruption? And I think that reasonable prediction had to be at the time that the action was taken, not with 2020 hindsight today, after the events of April and George Floyd. When was what year was this? I want to say this was 2017. All right. Well, there are plenty of issues of the same in 2017. Yes. But I'm going to reserve the rest of my time, but I'm going to end with this court has recognized that police officers are not entitled to watered down protections under the First Amendment that get the same as lawyers or teachers. And I'll reserve my remaining time. Thank you. Good morning. May it please the court. Jackie Nichols on behalf of the appellate police, the Las Vegas Metropolitan Police Department, Devin Ballard, and Patrick, specifically the department's interest in establishing a relationship with the community that it represents and that it's required to maintain its public safety and order. Your Honor, hit on the point that in today's society, that promoting excessive force and in particular deadly force with a firearm, it's equivalent to a racial slur, as evident by the climate in today's society. And even in 2016, this incident happened at the end of December 2015. So even in 2016, police departments were being criticized and so in this society where the community has a concern, police departments use the force, police department Miss Nichols, can you hear me? Richard, there's a problem with her. Yes, Judge, I am seeing that we seem to have lost Miss Nichols. And while she was speaking, she was cutting out. Yes, Judge, she's fallen off of the call, it appears, and hopefully can get back to us quickly. We're working on contacting her directly, Judge. Thank you very much. Okay. Meeting ID followed by pound. By pound. Otherwise, just press pound to continue. Miss Nichols, are you back with us? I am. I'm via phone. Apparently, I'm having significant issues with my Zoom video at this time. And I apologize for that. Judge, it appears we're ready. Okay, so Miss Nichols, you're going to proceed by phone, is that right? I'm sorry, what was that, Your Honor? You're going to proceed by phone? I am, Your Honor, because of my significant issues with Zoom. As I was, I'm sorry, I don't know exactly how much you heard before I was inadvertently cut off. So what I would like to focus on is the department's interest under the balancing test and the reasonable prediction that the appellant's comment here would lead to a disruption. As I asked Mr. Moody, why are we focusing on disruption? I don't understand. It seems to me, I mean, reading from McPherson, for example, it has to have a detrimental impact on working relationships, or impedes the performance of the speaker's duties, or interferes with the regular operation of the enterprise. And it happens that most of these cases seem to focus on disruption. But if the person can't, if the content of the communication suggests that he can't do his job, I don't understand why we're looking at disruption. My understanding of what of the first trigger here was that the judgment was made that this comment indicated that he was become callous as to killing and since given his particular job, that was a problem with regard to his ability to carry out his job. And why does it matter whether anybody knew about it or was disrupted? No, you're absolutely right, Your Honor. And so, and that is that that's the route that I was going in the sense that while the magic phrases that are used in case law is a reasonable prediction of disruption, I do believe that the department has satisfied its obligation because the department was concerned that he was unfit to serve as a SWAT sniper. And they think his duties, which is not in dispute here is is extremely important because as a SWAT sniper, and not just a SWAT officer, his response abilities dealt with precision shooting. He testified in his deposition that he has given optics to where he's set up in a tactical advantage and he's able to see things that, for instance, a patrol officer is unable to see. And so the concern was based off of his lack of judgment on promoting deadly force in a Facebook comment, where a suspect was apprehended when no force was necessary. There was a concern, obviously, that he didn't have any issue with pulling the trigger. Isn't there a factual dispute on what Mr. Moser's statement meant? Seems like the district court took the view that he was advocating unlawful violence as the suspect was being arrested. And obviously that would, I think it would be at the bottom level of any protection level. But Mr. Moser, I think in his internal investigation interview, said it was really maybe more about officers being ambushed, that he was talking not about the arrest of the suspect, but when the suspect had earlier shot the other officer, he was hoping and he was saying that officer should have fired defensive shots. It was more maybe hyperbolic, maybe inflammatory, but a comment on police officers being ambushed, a political commentary. If it's that, I think there's quite different meaning from unlawful use of force of shooting people, you know, without justification. I mean, why is it that a factual issue that the district court shouldn't have decided on summary judgment? Well, your honor, I believe that the court has to look to the forum content and context of the speech from the record as a whole. And the issue that you bring up is that Moser, that the appellate here is trying to, from an after the fact characterization, trying to say this is what he meant. And that was an issue before this court in DeRochers where they were saying, look, this is what we meant by our comments in relation to our chain of command, that we were upset, it dealt with efficiency purposes. And the Ninth Circuit said, while we understand that's maybe what you meant, that is not what the post said. And nothing in the post specifically, which if you look at the record page 817, nothing in there references the officer who was ambushed having the ability to defend himself. This is a comment on a Facebook post. I don't know if people will, you know, it's not a research paper, you know, that's kind of off the cuff statement on a comment. So, you know, I probably, you know, I agree that probably the district court's interpretation is probably a more reasonable one. But, you know, the statement that Mr. Moser put in, you know, it's plausible. And I'm not sure, you know, this report was correct to make that factual determination. Well, Your Honor, I believe that the purpose behind the appellant context in saying that it related to the ambush of the officer and the officer being able to defend himself was to justify the issue that it dealt with a matter of public concern. And that is a legal issue. It's not a factual issue. But even so, Your Honor, again, we're at the summary judgment stage. So even if you take the facts in a light most favorable to the plaintiff, that does not demean the department's interest in the fact that they believed that the SWAT, that the appellant as a SWAT sniper was unfit to perform his duties because he is nonetheless promoting the deadly, the use of deadly force with a weapon, which is exactly what he does as his job as a SWAT sniper. I'd like to also focus on the appellant kind of mentioned this in both of his briefs regarding, you know, the use of force as it relates to a SWAT sniper and a patrol officer. They're one in the same. The standard across the department in the United States is the same under Graham v. Connor. And while that is true, this argument fails to recognize that as a SWAT sniper, again, he is put in a tactical advantage. And the record reflects that he had been involved in four prior officer-involved shootings as a SWAT sniper. And that is significant based off of the department's reasonable prediction that he would, again, be involved if he were to stay in the position of a SWAT sniper, that he would again be involved in an officer-involved shooting. And the department, in order to mitigate their risk and their concern of whether or not he could properly do his job as a SWAT sniper, transferred him to patrol, where it's not disputed that patrol officers may be put in a position where deadly force may be necessary. But the difference is the substantial likelihood of a trained SWAT sniper shooting another individual compared to a patrol officer, there's a huge gap between the two positions. So suppose there's a schoolteacher who, he or she doesn't like certain books, other content, and in his or her private time, burns the books in protest. Could a school fire that teacher? Because the teachers probably shouldn't burn books. Unfortunately, I didn't hear the last sentence. Could a teacher fire her for what? For burning books in protest. And presumably, we don't want teachers to burn books. Could the that? Well, first, your honor, I'd like to preface that I'm not completely familiar with all of the obligations that maybe a teacher may have. But I would like, in drawing a distinction between that fact pattern that you just gave and the issue in this case, is that a sniper's duty is to shoot another individual. So, you know, I don't think that is the same concept of a teacher burning a book. I think those are drafts. Was Huck Finn, and it's assigned in the class, and the teacher and his or her spare time, private capacity, burns a book of Huck Finn. I'm sorry, you were breaking up. Can you please repeat that? Sure. Suppose the teacher is an English teacher, and the assigned book is, in the school district, is Huckleberry Finn. And the teacher, in his or her spare time, burns a copy of Huck Finn. Could the school district fire that teacher? Again, I'm not familiar with the particular law over education. And I apologize, but I don't think I can necessarily comment on that one way or another. I thought that, to me, the difference is that here, the problem is how he's going to perform in the job. He said it on his off time, but the concern is not about his off time. It's about his on time. That's correct, Your Honor. There's no dispute here that he spoke as a private citizen. We understand that he made the comment at home while he was off duty. That's not even the issue here. It's his lack of judgment as a SWAT sniper based off of his comment. And I think it's also relevant, as the Eighth Circuit Court found in Tyndall, that the appellant here recognized that this type of comment could bring issue with the public. In his internal affairs interview, and that's page 84 of the record, he was specifically asked, could you see how this comment could negatively impact the department and bring public discredit? And he said, yes, sir. And so I think that's another fact that's important, as far as from a summary judgment standpoint is concerned here, and what the department's interests are. Your Honors, do you have any other additional questions? I have a question. Do you think this question of disruption is a legal question for the court, or is it something that's a factual issue to be decided? Well, the balancing test itself is a question of law. Sure. So while there are factual inquiries that are necessary, I don't believe that this is an issue of fact. This is the department's position. There's no evidence to refute the department's position. I have a question here. If the chief of police or somebody in charge says it's disruptive, is that enough? No, Your Honor. To say in a blanket fashion that this is disruptive, no. But that's not what happened here. What happened here is that the department's taking into consideration the role and responsibilities of a SWAT sniper and the likelihood of him pulling a trigger again in that position is substantial. And based off of his comment that deadly force is okay to use in a situation where deadly force was not necessary, it really goes to his fitness to serve as a SWAT sniper. Well, of course, the patrolman on the street doesn't have that as the only job, but the patrolman on the street has to pull his weapon at times also, right? Absolutely. You are correct, Your Honor. But again, it goes to the job duties. And if you look, the SWAT sniper's job duty is precision shooting. That is their main focus. Whereas, like you just mentioned, a patrol officer has other duties. And the likelihood, albeit it still exists, but the likelihood that a patrol officer will be in a position to use deadly force is different than a SWAT sniper. Is that all in the record by the department to set that out? Yeah, that's through his internal affairs investigation, which is in the record at by his chain of command testimony. Patrick Novell testimony was at 191 through 202. And then Devin Ballard was 204 through 211. And Mr. Moser testified as to his specific job duties within his deposition testimony. And that begins at 191 and ends at 201, Your Honor. His Facebook page actually had a picture of a sniper, right? And that is correct, Your Honor. And there's multiple, within the record, there's multiple pictures of the Facebook comment. But in reviewing the record, it's page 817 that gives the most clear depiction of what his profile picture was, which is almost like a I believe a firearm in his hands, and then the word sniper across his chest. Okay, if you don't have anything else, my colleagues. Thank you. Thank you very much. Mr. Levine. We can't hear you. You're on mute. You're on mute. Thank you. I would like to start with what is actually in the record. The evidence in the record was that a patrol officer is more likely to have to use deadly force than a SWAT sniper. There is nothing about the precision shooting that is affected, i.e. his aim. I thought the SWAT sniper's job was to use deadly force. No, SWAT snipers are more likely to have to use deadly force when they are called out, because the circumstances of their call out, the constitutional requirements permitting deadly force are already established. In other words, it's already escalated to the point that deadly force would be authorized when SWAT is called out, whereas in a normal patrol officer, they have to go up the force continuum. But there's a very important point that goes, I think, to Your Honor's contention about why does this have to be about disruption? What about qualification for the job? And I'm going to cite to you, it's at Excerpts of the Record, Volume 2, 208. When I questioned Captain Ballard, he stated that there was nothing about Moser's Facebook post which interfered with his ability to perform as a SWAT officer. That was not the rationale given for his demotion. They didn't say, we determined he is no longer qualified. Rather, what they did was, and this is where evidence is important in developing the record below, they said, if he's involved in another shooting in the future, that's an if, well, his comment could be used against him if there was a lawsuit brought against the department. And that is exactly the sort of speculative, impermissible rationale to be utilized under the Pickering Balancing Test. Judge Seidler asked about, I think it was Judge Seidler who asked, isn't there a fact issue? Perhaps it was judgely, I apologize. Or doesn't it have to be evidence? Yes. Under Nichols v. Dancer, you must have evidence of disruption or predictions by which the court may measure whether or not the employer's assertion is reasonable. And there was none in this case other than if somebody actually managed to figure out who he was by doxing him, i.e., you know, scanning internet records and databases to try to figure this out, because he did not identify himself as a sniper. And he contested. I have a picture of a sniper. I'm sorry, he did not contest that he was a Metro officer. I apologize, I misspoke. He did not state in the post, there was nothing in the post, his disposition, that will allow him to be identified as a Metro officer. The post says we. Right. But the post also does not identify which agency was the arresting agency. For all any reader could tell, it was Nevada Highway Patrol, Henderson Police Department, North Boston. There was a comment in a newspaper article. Didn't the newspaper article say? No. No, newspaper article isn't in the record. But no, he was commenting on an earlier newspaper article about a manhunt. As far as a reader could tell, it could be my police officers at the Clark County School District Police Department. I'm the general counsel, amongst others. Nobody can tell, based upon we, that he's actually a Metro officer. But again, it was speculation. If somebody could figure it out, the determined internet sleuth, as I call it. Oh no, somebody did figure it out. No, for all we know, that it was a somebody who knew him personally, who was a member of the public. When that person is a member of the public? Well, remember, as I indicated in footnote seven, we don't know what the privacy settings are, and whether or not this was a conversation contained within a tight-knit group of law enforcement or otherwise. Thank you. Thank you very much. It's a very interesting case and helpful arguments. A motion versus Las Vegas Metropolitan Police Department is submitted and we are adjourned. Hey Mayor, this is Richard.
judges: Siler, Berzon, Lee